**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**TACOMA DIVISION**

| | |
|---|---|
| Yi-Nung Yeh,<br>Plaintiff,<br>v.<br><br>Taiwan Semiconductor Manufacturing Co. Ltd., TSMC North America, TSMC Technology, Inc., TSMC Arizona Corporation, and TSMC Washington, LLC,<br><br>Defendants. | Case No. 3:26-cv-05388<br><br>**COMPLAINT**<br><br>FOR EMPLOYMENT DISCRIMINATION<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Yi-Nung Yeh brings this action on behalf of herself and a class of similarly situated individuals to remedy pervasive, ongoing gender discrimination by Taiwan Semiconductor Manufacturing Co., Ltd., TSMC North America, TSMC Technology, Inc. ("TSMC Technology"), TSMC Arizona Corporation ("TSMC Arizona"), and TSMC Washington, LLC ("TSMC Washington") (collectively, "TSMC") and alleges as follows:



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

## NATURE OF THE ACTION

1. Taiwan Semiconductor Manufacturing Co., Ltd. ("TSMC Taiwan") is a semiconductor manufacturing corporation headquartered in Hsinchu, Taiwan. TSMC Taiwan controls four subsidiaries in the United States: TSMC Washington, LLC, TSMC Arizona Corporation, TSMC North America, and TSMC Technology, Inc. Collectively, these five related corporations are referred to herein as "TSMC."

2. TSMC is the world's leading manufacturer of semiconductors, the chips that power everything from smartphones to cars to satellites to weapons systems. TSMC manufactures over 90% of the world's leading-edge logic chips, supplying well-known customers such as Google, Nvidia, and Apple with the chips used in their technology.

3. As of February 28, 2025, TSMC employed 85,134 people worldwide, 66.4% of whom were men and 33.6% of whom were women.[1] TSMC's American operations mirror TSMC's worldwide staffing practices. In its American operations, 72.6% of TSMC's U.S. workforce is comprised men and just 27.4% is comprised of women.[2]

4. As discussed below, this grossly disproportionate workforce is the result of

[1] *See* 2024 Annual Report at 115, *available at* https://investor.tsmc.com/sites/ir/annual-report/2024/2024%20Annual%20Report-E.pdf

[2] *Id.* at 164.



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

TSMC's intentional pattern and practice of employment discrimination against women, and in favor of men, including discrimination in hiring, staffing, termination, promotion, and compensation decisions.

5. TSMC's employment practices violate the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981") and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiff seeks, on her own behalf, and on behalf of a class of similarly situated individuals, declaratory, injunctive, and other equitable relief, compensatory and punitive damages, including pre- and post-judgment interest, attorneys' fees, and costs to redress TSMC's pervasive pattern and practice of sex discrimination.

**PARTIES**

6. Plaintiff Yi-Nung Yeh is a woman who resides in Clark County, Washington and is a former employee of TSMC Washington.

7. Taiwan Semiconductor Manufacturing Co., Ltd. is a Taiwanese company, and is located at No. 8, Li Hsin Road VI, Hsinchu Science Park, Hsinchu 300-78, Taiwan, R.O.C. It is the parent corporation of Defendants TSMC North America, TSMC Technology, TSMC Arizona, and TSMC Washington.

8. TSMC North America is a California corporation with its principal place of business at 2851 Junction Avenue, San Jose, California 95134. TSMC North



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

America provides primarily sales, technical support, business operations, and customer service support in North America for its ultimate parent, Taiwan Semiconductor Manufacturing Co., Ltd.

9. TSMC Technology is a Delaware corporation, with its principal place of business at 2851 Junction Avenue, San Jose, California 95134. TSMC Technology provides primarily technology support at customer sites and research and development support in North America for its ultimate parent, Taiwan Semiconductor Manufacturing Co., Ltd.

10. TSMC Arizona is an Arizona corporation, with its principal place of business at 5088 W. Innovation Circle, Phoenix, AZ 85083. TSMC Arizona provides semiconductor manufacturing support to its ultimate parent, Taiwan Semiconductor Manufacturing Co., Ltd.

11. TSMC Washington is a Delaware corporation. Its principal place of business is at 5509 N.W. Parker Street, Camas, Washington 98607. TSMC Washington provides semiconductor manufacturing support to its ultimate parent, Taiwan Semiconductor Manufacturing Co., Ltd.

## JURISDICTION

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 1981(a), and 42 U.S.C. § 2000e-5(f).



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of a state and a foreign corporation.

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of interest and costs, and involves at least one class member who is a citizen of this State and is brought against a foreign corporation.

15. This Court has personal jurisdiction over TSMC because each Defendant engages in continuous and systematic business contacts within the State of Washington. Further, Defendant TSMC Washington, a subsidiary of Taiwan Semiconductor Manufacturing Co., Ltd., maintains a substantial physical presence in this State, with its headquarters located in Camas, Washington. The four American TSMC subsidiaries are alter egos of TSMC Taiwan, which controls all operations, including hiring and staffing, of the subsidiaries, and has used this control to effectuate the discriminatory scheme set forth herein across all entities. In addition, TSMC Taiwan and its four American subsidiaries operate as an integrated enterprise or single employer by virtue of their common management, the interrelations of their operations, the centralized control over their labor relations, and their common ownership.



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

16. Ms. Yeh exhausted her administrative remedies by filing a charge of discrimination with the Equal Employment Opportunity Commission and receiving a Notice of Right to Sue.

**VENUE**

17. Venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3) because TSMC resides in this District, conducts business in this District, and engaged in discriminatory conduct in this District. Additionally, TSMC engages in continuous and systematic business contacts within this District, and maintains a substantial physical presence in this District, including TSMC Washington's operation of offices in Camas, Washington.

**STATEMENT OF FACTS**

*Overview of TSMC's Business Model*

18. TSMC is the world's leading manufacturer of semiconductors. Semiconductors are often referred to as "microchips" or "chips." Microchips are integrated circuits fabricated onto a substrate—typically silicon—that conducts electricity. Modern microchips are small, the size of a fingernail or smaller. Small, modern microchips contain billions or even trillions of electronic components—transistors, resistors, and capacitors—integrated and programmed to perform



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

complex tasks used in advanced electronics, such as smartphones, computers, advanced weapons of war, and artificial intelligence.

19. Microchip technology has improved over time. These improvements have been driven by the distance between transistors on the chip. Transistors control electrical signals within a chip's integrated circuit, dictating the chip's programmed logical operations. The more transistors that fit within a chip's integrated circuit, the faster and more energy-efficient the chip, as electrical currents do not need to travel as far to control the chip's logic function.

20. TSMC manufactures the world's most advanced chip, known as an N2 or 2nm chip. "Nm" refers to nanometers. A single nanometer is equal to one billionth of a meter. By way of comparison, a single strand of hair is equal to 100 nanometers. TSMC's N2 chip is a two-nanometer chip, which means that transistors on the chip are located two nanometers away from each other. A two-nanometer chip is roughly 10-15 percent faster and 25-30 percent more efficient than a three-nanometer chip. No other manufacturers produce a 2nm chip. Because the world's most advanced technologies, including artificial intelligence, require the fastest chip possible, TSMC is currently the world's most advanced chip supplier.

21. TSMC is a contract manufacturer, meaning that it does not design computer



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

chips. That is the role of TSMC's clients, which include Nvidia, Apple, Google, Amazon, Microsoft, and other major corporations. TSMC's clients are located predominantly in America, and America accounts for roughly three quarters of TSMC's $66 billion per year in revenue.

22. China has long viewed Taiwan as a province of China and has reportedly developed plans to invade the island. TSMC's advanced chip manufacturing capability has reportedly given China more of an incentive to invade Taiwan, as the Chinese government could assume control of TSMC. The prospect of China taking over TSMC has given America (and other countries) an incentive to protect Taiwan from China. TSMC is known as Taiwan's "silicon shield."

23. Given geopolitical and economic pressures, TSMC has decided to heavily invest in bolstering its American presence. While it has long operated a chip fabrication facility—known as a "fab"—in Camas, Washington, it is investing an additional $100 billion in constructing and operating three fabs in Phoenix, Arizona. Through the CHIPS and Science Act of 2022 (the "CHIPS Act"), the federal government plans to invest $6.6 billion in TSMC's Phoenix operations.

24. Those applying for CHIPS Act funding committed to "guarantee[ing] all workers access to a safe environment that is free of harassment, discrimination, and



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

retaliation,"[3] and were required to submit a plan "demonstrat[ing] appropriate investments and commitments to recruit, train, hire, retain, and upskill a skilled and diverse workforce,"[4] including "metrics and processes to measure, track, and report publicly on these goals and commitments."[5]

25. Projects that applied for more than $150 million in direct funding also had to have a plan to provide facility and construction workers with access to child care, a commitment that would be "essential to getting people—especially women—into the workforce."[6] TSMC submitted a diversity plan in applying for CHIPS Act funding and, in return, was awarded $6.6 billion in direct funding under the Act to support TSMC's Arizona facilities.[7]

*TSMC's Pattern or Practice of Discrimination*

26. TSMC operates as a hierarchy, including in staffing. TSMC Taiwan dictates staffing practices that are closely followed by its four American subsidiaries:

---

[3] CHIPS for America Fact Sheet: Building a Skilled and Diverse Workforce, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY (Feb. 28, 2023), https://sykes.house.gov/imo/media/doc/chips_nofo-1_building_skilled_diverse_workforce_fact_sheet_0.pdf.

[4] Workforce Development Planning Guide, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY (Mar. 27, 2023).

[5] CHIPS for America Fact Sheet: Building a Skilled and Diverse Workforce, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY (Feb. 28, 2023), https://sykes.house.gov/imo/media/doc/chips_nofo-1_building_skilled_diverse_workforce_fact_sheet_0.pdf

[6] *Id.*

[7] TSMC Arizona and U.S. Department of Commerce Announce up to US$6.6 Billion in Proposed CHIPS Act Direct Funding, the Company Plans Third Leading-Edge Fab in Phoenix, TSMC (Apr. 8, 2024), https://pr.tsmc.com/english/news/3122.



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

TSMC Washington, TSMC Arizona, TSMC North America, and TSMC Technology. TSMC Taiwan approves hiring, job placement, and promotion decisions in the U.S.

27. TSMC has long recognized that it has a gender imbalance in staffing. Women are hired significantly less frequently than men, and when hired, women are not afforded the same opportunities as men both in jobs in which they are hired as well as in opportunities to advance. Women are also paid less, talked down to in the workplace, and exposed to an overtly, sexually-charged environment where sexual innuendo and harassment are common. As of February 28, 2025, TSMC employed 85,134 people worldwide, 66.4% of whom were men and 33.6% of whom were women.[8]

28. Women who fare the worst at TSMC are those qualified for high-paying roles, such as women with advanced degrees. In its 2023 Sustainability Report, TSMC recognized that there are "[g]ender disparities in high-paying positions resulting in . . . occupational segregation."[9] This occupational segregation is reflected in gender staffing by TSMC job type. High paying jobs are filled largely with men as opposed to women, including "Managers" (85.4% men vs. 14.6%

[8] *See* 2024 Annual Report at 115, *available at* https://investor.tsmc.com/sites/ir/annual-report/2024/2024%20Annual%20Report-E.pdf

[9] *See* 2023 Sustainability Report at. 37, *available at* https://drive.google.com/file/d/1JliVutJpNHrRasf8diOWfbXxueJl9Gqk/view



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

women), "Professionals" (77.9% men vs. 22.1% women), and "Assistants" (87.2% men vs. 12.2% women).[10] In stark contrast, the lowest-wrung, lowest paying category of position that TSMC reports—"Technicians"—consists largely of women: 68.6% women vs. 31.4% men.[11] Fifty-nine percent (**59%**) of the women that TSMC employs are relegated to its lowest-level, lowest-paid position (Technician),[12] while only fourteen percent (**14%**) of the men that TSMC employs are staffed in this same role.[13]

29. TSMC also employs, by and large, a single race and national origin in Taiwan: Taiwanese nationals of East Asian descent. Employing largely one race and national origin in Taiwan is understandable, considering the homogeneity of the local labor pool in Taiwan.

30. However, TSMC's American operations mirror TSMC's staffing practices in Taiwan as it pertains to both race and gender. In its American operations, TSMC employs 72.6% men vs. 27.4% women.[14] Women are largely relegated to the lowest-level jobs, such as customer service roles, where women field complaints from customers and are responsible for invoicing. Women are also paid less than

[10] *See* 2024 Sustainability Report at 157 (available at https://drive.google.com/file/d/1M3m4JSV8j_Rjca8iitEsEupM7HoUUc2V/view
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.* at 164.



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

men across all job types: Managers, Professionals, Assistants, and Technicians.[15] TSMC's American operations are also predominantly East Asian, as hiring managers and other executives—including those working for TSMC Taiwan, which dictates staffing decisions—prefer East Asian employees over all others, especially those who speak Mandarin.

31. Managers at TSMC often make explicit the company's preference for men. For instance, a manager at TSMC Arizona stated that women should not be hired because they are weak and cause trouble with men.

32. Women who are hired experience unwanted touching and are forced to work in a highly-sexualized environment in which women are victimized by sexual harassment and objectified. For instance, on one occasion, a section manager at TSMC Arizona told employees to turn off their phones and laptops during a meeting and then displayed pictures of women in bikinis. Inappropriate sexual jokes among TSMC employees are also common, and women are inappropriately referred to as "juicy," "sexy," "cute," and "cutie."

33. Further, women are demeaned, talked over in meetings, treated as incapable, and ignored.

34. In addition, some TSMC managers ask job candidates if they plan to

[15] *Id.* at 162.



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

become pregnant, which TSMC seeks to avoid.

35. Cumulatively, these actions create a hostile work environment for women who are forced to endure sub-par working conditions because of their sex.

*Yi-Nung Yeh's Experience*

36. Ms. Yeh is a highly educated and skilled Software Engineer. She is originally from Taiwan, and received a Bachelor of Science in Electrical Engineering from National Tsing Hua University in June 2011. Ms. Yeh then attended graduate school at the National Taiwan University, receiving a Master of Science in Communication Engineering in June 2013. After that, Ms. Yeh moved to America to attend graduate school at Georgia Institute of Technology, where, in December 2016, she received a Master of Science in Computational Science and Engineering.

37. After obtaining her Master's degree, Ms. Yeh joined Amazon.com, Inc. as a Software Development Engineer. She worked there for seven years, received her green card, and was promoted twice, ultimately leading an eight-person software development team. Ms. Yeh left Amazon and joined Oracle Inc., where she led a fifteen-person software development team.

38. In July 2025, Ms. Yeh applied to two jobs with TSMC Washington: a Principal Software Engineer (Tech Leader) role and a Principal Software Engineer



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

role. Both jobs were within a newly-formed TSMC Washington department named the North American Software Center ("NASC"). NASC's mission is to provide a standardized software platform for all of TSMC's American operations, most notably TSMC Arizona, where substantial investments are being made to expand TSMC's American presence. While located in Vancouver, Washington, NASC is in fact directed and managed by TSMC Taiwan. Brandon Wang, NASC's director, reports directly to Jack Ye, who is the Director of the Platform Engineering Division ("PLED") within TSMC Taiwan. The entire NASC staff has weekly video calls with Mr. Ye and his team, and the PLED division instructs and oversees NASC staff. Within PLED, Mr. Ye has twelve managers who report to him, only one of whom is a woman.

39. Mr. Wang initially interviewed Ms. Yeh for the two NASC jobs to which she applied. During the interview, even though the Job Description explicitly stated that the role was on-site in Vancouver, WA, Mr. Wang specifically asked if moving there would be convenient for Ms. Yeh. He then immediately explained his question by saying, "I was thinking whether you have kids who might need to transfer schools or something like that."

40. Mr. Wang advanced Ms. Yeh's application for only one of the jobs, the Principal Software Engineer (Tech Leader) role, and did not advance Ms. Yeh for



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

the Software Engineer position. Ms. Yeh had four additional rounds of interviews. Terry Zhou, from NASC, interviewed Ms. Yeh, asking her coding-related questions. Mr. Wang then interviewed Ms. Yeh again, asking system design-related questions. After that, Ms. Yeh had two interviews with TSMC Taiwan executives: Mr. Ye and, separately, Owen Kuo, an HR executive in Taiwan. TSMC Taiwan—in particular, Jack Ye—approved Ms. Yeh for the Principal Software Engineer (Tech Leader) role. On August 12, 2025, TSMC formally offered Ms. Yeh the position of Principal Software Engineer (Tech Leader), which she accepted the same day.

41. Ms. Yeh joined TSMC Washington on September 15, 2025. Upon joining TSMC, without explanation, Ms. Yeh discovered that TSMC had changed her title from Principal Software Engineer (Tech Leader) to Technical Manager. Ms. Yeh had two peers at her level within NASC: Chun-Yi (David) Su, who joined TSMC in (or around) August 2025, and Terry Zhou, who joined TSMC in (or around) July 2025. At the time Ms. Yeh joined TSMC, Mr. Su had two direct reports: Jennifer Zhang and Michael Yan. Mr. Zhou also had three direct reports: Ben Gift, John Nicholson, and Che-Chuan (Frank) Li. After Ms. Yeh joined TSMC, two more employees were hired into NASC: Victor Chang, who reported to Mr. Su, and Evan Yang, who reported to Mr. Zhou. Unlike her male counterparts, TSMC made no



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

arrangements for Ms. Yeh to act as an interviewer or to otherwise participate in the NASC hiring process.

42. Similarly, unlike to Ms. Yeh's male colleagues, Ms. Yeh had no direct reports, and TSMC made no plans to support Ms. Yeh with direct reports (despite the fact that her male colleagues supervised between three and four employees). Organizationally, from the very outset, this reporting structure put Ms. Yeh at a disadvantage. The three Tech Leaders—Ms. Yeh, Mr. Su, and Mr. Zhou—were all expected to develop and implement distinct technology platforms. But without any organizational support, Ms. Yeh had no one to assist her with her development and implementation duties, while her male counterparts enjoyed significantly greater resources. TSMC Taiwan conducted weekly video conference updates with the entire NASC staff and carefully tracked project progress among the three Tech Leaders. With no direct reports to assist with her project work, Ms. Yeh was not put on a level playing field with her male counterparts. Upon information and belief, Mr. Su and Mr. Zhou also were paid more than Ms. Yeh. Further, a substantial component of Ms. Yeh's, Mr. Su's and Mr. Zhou's compensation consisted of performance-based bonuses. Because Ms. Yeh had no supporting team members, her ability to perform as well as her male counterparts was diminished from the outset, which necessarily would have reduced her bonus potential.



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

43. NASC had explicit hiring guidelines that concerned Ms. Yeh. Specifically, as a matter of policy, NASC would recruit and hire only L-1 visa transfers from TSMC Taiwan as well as U.S. permanent residents and citizens. It would not recruit and hire individuals who required an H-1B visa, TN visas (applicable to Canadian and Mexican citizens), E2 visas (applicable to Australian and New Zealand citizens), or OPT work authorization, and would not recruit refugees and asylees (who had not obtained permanent resident status), and others in the U.S. As a practical matter, these hiring guidelines resulted in an NASC team consisting almost entirely Mandarin speaking individuals of East Asian descent. Only two of the NASC team—Mr. Gift and Mr. Nicholson—did not speak Mandarin. Not speaking Mandarin put these individuals at a distinct disadvantage in the workplace. Critical work was discussed in Mandarin. For example, NASC's weekly video conferences with TSMC Taiwan were conducted in Mandarin. These conferences were PLED division-level meetings, and it was through these conferences where employees were allowed—and expected—to showcase their work to TSMC leadership. Participation in the conferences was (and is) critical for performance and advancement within TSMC. Mr. Gift and Mr. Nicholson attempted to participate in the weekly calls using a "live caption" translation tool, but the translation was so poor that effective participation in the conferences was



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

impossible. In response to this issue, Mr. Su tagged the two non-Mandarin speakers in the NASC-team channel and stated that he felt that the "live captions quality is OK" because they were "75%-80% accurate." Mr. Gift and Mr. Nicholson ultimately stopped attending the conferences altogether.

44. Like the work environment in TSMC Taiwan, NASC also had a male-centric office culture. Of the eleven NASC employees, only two—Ms. Yeh and Ms. Zhang—were women. Shortly after she joined NASC, during an in-person meeting with Ms. Yeh, Mr. Su, Ms. Zhang, and Mr. Yan, Mr. Su made a derogatory comment about Ms. Yeh, suggesting (incorrectly) that she was working on an H-1B visa and would not be working long at TSMC due to national criticisms over the H-1B visa program. Ms. Yeh interpreted Mr. Su's comments as sending a message to NASC that Ms. Yeh would not last long within NASC. Similarly, Mr. Wang micromanaged Ms. Yeh in a manner that differed materially from his management of Mr. Su and Mr. Zhou. While Ms. Yeh's male counterparts were afforded substantial autonomy and allowed to independently manage their own work streams, Mr. Wang trivialized Ms. Yeh, including cautioning her not be "too eager[] to prove [herself]" after Ms. Yeh presented a detailed project plan to him and instructing Ms. Yeh to copy Mr. Wang on all communications when Ms. Yeh traveled to Taiwan for work, which, upon observation, Ms. Yeh's male



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

counterparts were not required to do.

45. Ms. Yeh quickly grew concerned about an obvious and open practice of discrimination. On September 23, 2025, she initiated a series of reports to HR, the legal department, TSMC leadership, and a company-appointed third-party investigator about the discrimination she was observing and experiencing, starting with her concerns about comments that Mr. Su had made during in-person meetings a few days prior. Following Ms. Yeh's initial complaint, HR Representative Amy Mitchell, after consulting with Mr. Wang, responded by characterizing Ms. Yeh as "too sensitive," ordered her to cease emailing her grievances, and asked if Ms. Yeh could "accept" continued disparate treatment. Subsequent escalations to HR Employee Relations Lead Mollie Elfring and HR Director John Megli were met with hostility and deliberate indifference, including Mr. Megli informing Ms. Yeh on October 7 that he had scheduled a meeting three weeks out—a clear effort to delay the investigation and to avoid addressing Ms. Yeh's reports of ongoing harm. On October 8, Ms. Yeh followed-up with HR and reported additional concerns, including about Mr. Wang's discriminatory micromanagement, after which Mr. Megli conducted a sham "internal investigation" that was closed after just five days and without interviewing Ms. Yeh. On October 14 and 15, following the closure of that investigation, Ms. Yeh escalated the aforementioned concerns and additional



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

concerns (about being required to meet with Mr. Wang more frequently than her peers, both of whom were male) to Legal, senior leadership, and Mr. Ye (Mr. Wang's direct manager, TSMC Taiwan).

46. On October 17, 2025, TSMC North America Legal VP Steven Schulman emailed Ms. Yeh to tell her that a third party had been retained to investigate her complaints, assuring her that her concerns would be "thoroughly reviewed."

47. During October 30, November 5, November 6, and November 12 meetings with the third-party investigator, Ms. Yeh discussed the aforementioned and other concerns, and explicitly stated that she observed differential treatment based on gender between her and her two male peers in terms of direct reports, resources, and opportunities, and that she seldom saw female high-level members in their group. She also asked the third-party investigator and senior leadership to investigate the HR Department's dereliction of duty and bias in handling Ms. Yeh's previous complaints. Ms. Yeh also reported her concerns about the use of a live caption that excluded non-Mandarin speakers from participating in meetings to the third-party investigator on November 5 (and thereafter reported the same concern to HR, Legal, and senior leadership) and emailed the third-party investigator and senior leadership on December 3 to report her concerns about TSMC's exclusionary hiring practices.



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

48. Throughout this period, retaliation against Ms. Yeh intensified. On October 19, Mr. Wang and Mr. Ye canceled Ms. Yeh's critical technical discussions and Ms. Yeh was consistently excluded her from strategic resource planning sessions held exclusively with her male counterparts. And on November 6, Mr. Wang started imposing on Ms. Yeh unrealistic expectations and unattainable deadlines and downgraded her responsibilities from high-level architecture and roadmap design to routine backlog implementations. This pattern of institutional hostility and professional marginalization set the stage for further conflict regarding TSMC's lack of transparency and procedural irregularities.

49. While the investigation of Ms. Yeh's complaints was ongoing, Mr. Wang continued to insist on meeting with Ms. Yeh one-on-one. Ms. Yeh, however, had grown uncomfortable with Mr. Wang, and began requesting meeting agendas in advance of the one-on-ones, which Mr. Wang declined to provide.

50. TSMC did not rectify the hostile work environment following Ms. Yeh's complaints. On December 3 (after Ms. Yeh raised additional concerns regarding the company's hiring policies), Mr. Megli informed Ms. Yeh that the third-party investigation had concluded. The third-party investigator then confirmed that the scope of the investigation had been restricted "as determined by TSMC"—directly contradicting Mr. Schulman's assurances that Ms. Yeh's complaints would be



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

thoroughly reviewed and rendering the process ineffective. Ms. Yeh subsequently raised concerns about the integrity of the entire investigation. On December 8, Ms. Elfring further informed Ms. Yeh that no evidence was found that HR was targeting Ms. Yeh, and Ms. Yeh was expected to find a way to work with HR. VP of TSMC North America Legal Steven Schulman and CLO Sylvia Fang were copied on the communications between HR and Ms. Yeh but did not intervene. Two days later, on December 10, TSMC terminated Ms. Yeh's employment.

## CLASS ACTION ALLEGATIONS

51. Plaintiff brings this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for TSMC's systematic pattern and practice of discrimination against women in the United States. This action is brought on behalf of the following classes:

> All women who applied for positions with TSMC in the United States and were not hired, who were employed by TSMC in the United States and were not promoted, who were employed by TSMC in the United States and were underpaid compared to men, and/or who were employed by TSMC in the United States and were terminated and/or constructively discharged.

52. Members of the classes are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members is unknown to Plaintiff, it is believed to number in the thousands.



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

Furthermore, class members are readily identifiable from information and records in TSMC possession.

53. There are numerous questions of law and fact common to members of the classes. Among the common questions of law or fact are: (a) whether TSMC has intentionally discriminated against women in making hiring, staffing, appraisal, promotion, pay, and termination decisions; (b) whether TSMC has intentionally favored men in hiring, staffing, appraisal, promotion, pay,. and retention decisions and/or whether TSMC has intentionally disfavored women in hiring, staffing, appraisal, promotion, pay, and termination decisions; (c) whether TSMC's employment policies and practices are intentionally discriminatory; (d) whether TSMC has violated Title VII; (e) whether equitable and injunctive relief is warranted for the class; and (f) whether compensatory and/or punitive damages are warranted for the class.

54. Plaintiff's claims are typical of the class. Members of the class were damaged by the same discriminatory policies and practices employed by TSMC that disfavored women.

55. Plaintiff will fairly and adequately protect the interest of other class members because she has no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiff is committed to the vigorous



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

prosecution of this action and has retained competent counsel experienced in class litigation to represent her and the class.

56. Plaintiff and the class she seeks to represent have suffered substantial losses in earnings and other employment benefits and compensation as a result of TSMC's actions.

57. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because TSMC has acted and/or refused to act on grounds generally applicable to the class, making declaratory and injunctive relief appropriate with respect to Plaintiff and the class as a whole. Members of the class are entitled to declaratory and injunctive relief to end TSMC's systematic, common, uniform, unfair, and discriminatory policies and practices.

58. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) for determination of the damages claims of individual class members because the issue of liability is common to the class and the common nucleus of operative facts forms the central issue, which predominates over individual issues of proof. The primary question common to the class is whether TSMC has discriminated on the basis of sex in its employment practices. This question is central to the case and predominates over individual issues among the members of the proposed class. TSMC has engaged in a common course of



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

discriminatory conduct in a manner that has harmed all of the class members. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because certification will avoid the need for repeated litigation by each individual class member. The instant case will be eminently manageable as a class action. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

59. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4) to litigate Plaintiff's claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate TSMC's discrimination. Certification under this rule is also appropriate to decide whether TSMC has adopted a systemic pattern and practice of sex discrimination in hiring, staffing, appraisal, promotion, and termination decisions. Certification under this rule is also appropriate to determine classwide damages, including punitive damages.

**COUNT I**
**(Disparate Treatment on the Basis of Sex)**
**(Violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2)**
**(On behalf of Plaintiff and the Class)**

60. Plaintiff re-alleges each preceding paragraph as though fully set forth herein.

61. This claim is brought by Plaintiff on behalf of herself and the class.



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

62. Throughout the class liability period, TSMC has engaged in a pattern and practice of discriminating against individuals who are women: (a) knowingly and intentionally favoring men in employment decisions (i.e., hiring/staffing, appraisal, promotion, pay, and termination decisions), (b) knowingly and intentionally disfavoring individuals who are women (including Plaintiff) in employment decisions (i.e., hiring/staffing, appraisal, promotion, pay, and termination decisions), and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States.

63. As a direct and proximate result of TSMC's intentional discrimination, Plaintiff and class members have been denied employment and continued employment with TSMC.

64. TSMC's actions constitute unlawful discrimination on the basis of gender in violation of 42 U.S.C. § 2000e, *et seq*.

**COUNT II**
**(Disparate Impact on the Basis of Sex)**
**(Violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2)**
**(On behalf of Plaintiff and the Class)**

65. Plaintiff re-alleges each preceding paragraph as though fully set forth herein.

66. This claim is brought by Plaintiff on behalf of herself and the class.

67. Throughout the class liability period, TSMC has engaged in policies and practices relating to hiring, staffing, appraisals, promotions, pay, and



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

termination/retention decisions described herein that have resulted in a disparate impact on women who, as a result, are disproportionately not hired, not selected for positions, appraised poorly (and therefore not promoted), underpaid, and/or terminated or constructively discharged. These practices are neither job-related for the positions at issue nor consistent with business necessity, and have resulted in a disproportionately male workforce.

68. TSMC's actions constitute unlawful discrimination in violation of 42 U.S.C. § 2000e, *et seq*.

**COUNT III**
**(Hostile Work Environment on the Basis of Sex)**
**(Violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2)**
**(On behalf of Plaintiff and the Class)**

69. Plaintiff re-alleges each preceding paragraph as though fully set forth herein.

70. This claim is brought by Plaintiff on behalf of herself and the class.

71. Throughout the class liability period, TSMC has created a hostile work environment for individuals who are women by: (a) creating a sexually-charged workplace in which objectification of women is rampant and tolerated, (b) making comments about the capabilities of women and, particularly women who are pregnant or plan to become pregnant, (c) downplaying or discrediting their strong performances; (d) talking to them in a condescending manner or talking over them in meetings; (e) paying women less than their male counterparts; and (f) referring



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

to women in unprofessional an inappropriate terms, such as "juicy," "sexy," "cute," and "cutie."

72. As a result of TSMC's hostile work environment, many women are constructively discharged by the company, having been forced to resign because of the hostile work environment.

73. An objectively reasonable person would find that, as a whole, the environment within TSMC was hostile. And TSMC leadership was on notice of this hostile work environment, having received multiple employee complaints, but took no remedial action.

74. TSMC's hostile work environment constitutes a violation of 42 U.S.C. § 2000e, *et seq*.

**COUNT IV**
**(Retaliation in Violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2)**
**(On behalf of Plaintiff)**

75. Plaintiff re-alleges each preceding paragraph as though fully set forth herein.

76. This claim is brought by Plaintiff on behalf of herself.

77. Plaintiff engaged in a protected activity under Title VII by reporting to TSMC concerns about the corporation's discriminatory practices.

78. Plaintiff suffered harm as a result of engaging in this protected activity, including by being terminated.



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

79. A causal link exists between the harm Plaintiff suffered and the protected activity. TSMC retaliated against Plaintiff because she engaged in protected activity under Title VII, and TSMC terminated her shortly after Plaintiff raised concerns. But for TSMC's retaliation, Plaintiff would not have been treated in such a hostile manner and subjected to changes in the terms and conditions of her employment.

80. TSMC's actions constitute unlawful retaliation in violation of 42 U.S.C. § 2000e, *et seq*.

**COUNT V**
**(Retaliation in Violation of the Washington Law Against Discrimination (WLAD), RCW 49.60**
**(On behalf of Plaintiff)**

81. Plaintiff re-alleges each preceding paragraph as though fully set forth herein

82. This claim is brought by Plaintiff on behalf of herself.

83. Plaintiff engaged in a protected activity under the WLAD by reporting to TSMC concerns about the corporation's discriminatory practices.

84. Plaintiff suffered harm as a result of engaging in this protected activity, including by being terminated.

85. A causal link exists between the harm Plaintiff suffered and the protected activity. TSMC retaliated against Plaintiff because she engaged in protected activity under the WLAD, and TSMC terminated her shortly after Plaintiff raised



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

concerns. But for TSMC's retaliation, Plaintiff would not have been treated in such a hostile manner and subjected to changes in the terms and conditions of her employment.

86. TSMC's actions constitute unlawful retaliation in violation of RCW 49.60.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the class pray for relief as follows:

a. Certification of the case as a class action pursuant to Federal Rule of Civil Procedure 23;

b. Designation of Plaintiff as representative of the classes;

c. Designation of Plaintiff's counsel as counsel for the classes;

d. A declaratory judgment that the practices complained of herein are unlawful and violate Title VII;

e. A permanent injunction against Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

f. Order Defendant to adopt a valid, non-discriminatory method for hiring, staffing, performance appraisals, termination, and other employment decisions;

g. Order Defendant to post notices concerning its duty to refrain from discriminating against employees on the basis of sex;

h. Award Plaintiff and the Class compensatory damages for the harm they suffered as a result of Defendant's violations of Title VII;

i. Award Plaintiff and the Class pre- and post-judgment interest at the prevailing rate on the compensatory damages as a result of Defendant's discriminating against them in violation of Title VII;



KOTCHEN & LOW LLP
1918 NEW HAMPSHIRE AVE. NW
WASHINGTON, DC 20009
(202) 471-1995

j. Award Plaintiff and the Classes front- and back-pay, and such other equitable relief as the Court deems just and appropriate;

k. Award Plaintiff and the Class exemplary and punitive damages;

l. Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

m. Award Plaintiff and the Class such other relief as this Court deems just and appropriate.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff and the Class respectfully demand a trial by jury on all issues properly triable by a jury in this action.

DATED: April 16, 2026

Respectfully submitted,

By: /s/Daniel Kotchen
Daniel Kotchen (*pro hac vice pending*)
**KOTCHEN & LOW LLP**
1918 New Hampshire Avenue NW
Washington, DC 20009
Telephone: (202) 471-1995
Email: dkotchen@kotchen.com

/s/ Carl J. Marquardt
Carl Marquardt (WSBA # 23257)
Law Office of Carl J. Marquardt, PLLC
1126 34th Avenue, Suite 311
Seattle, WA 98122-5137
Telephone: 206-388-4498
Email: carl@cjmpllc.com

*Attorneys for Plaintiff and the Putative Class*